**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

ERIC JONES,

        Plaintiff,

    v.

GEORGIA PORTS AUTHORITY,

        Defendant.

CIVIL ACTION NO.: 4:20-cv-315

**O R D E R**

This action arises out of the disability-based discrimination Plaintiff Eric Jones allegedly suffered during his employment at Defendant Georgia Ports Authority ("GPA").  (Doc. 1-3, pp. 2–10.)  Plaintiff sued Defendant for allegedly violating the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Georgia Equal Employment for Persons with Disabilities Code, O.C.G.A. § 34-6A-1 *et seq*. ("Georgia Disability Code").  (Id. at pp. 7–9.) Specifically, Plaintiff alleges that GPA failed to provide a reasonable accommodation for his post-traumatic stress disorder and unlawfully discriminated against him when it terminated his employment.  (See id. at pp. 3–5, 8–9.)  Presently before the Court is GPA's Motion for Summary Judgment.  (Doc. 21.)  The motion is fully briefed by the parties.  (Docs. 21-1, 30, 33, 35, 36.)  For the following reasons, the Court **GRANTS** GPA's Motion for Summary Judgment.  (Doc. 21.)

# BACKGROUND

## I.     Factual Background

### A.     The Parties

Plaintiff served in the United States Army for four years in the early 1990s and saw combat in the Gulf War.  (See doc. 22, p. 3.)  Plaintiff now suffers from post-traumatic stress disorder ("PTSD"), which causes him to experience stress, nightmares, and flashbacks.  (Id. at pp. 3–4.)  A Veterans Affairs ("VA") physician first diagnosed Plaintiff with PTSD in 2015, though Plaintiff began experiencing symptoms when he left the Army in 1994.  (Id.; see doc. 31, p. 2.)  In June 2017, Dr. Maritza Laura of the VA began treating Plaintiff's PTSD.  (Doc. 22, p. 4.)

GPA is a state authority that operates Georgia's ports, including the Garden City, Georgia, facility.  (Doc. 21-1, p. 2; doc. 21-3, p. 1.)  GPA's operations in the Garden City facility include moving cargo containers.  (Doc. 21-3, p. 1.)  Specifically, GPA's "[c]rane [d]epartment" moves containers on and off oceangoing vessels and to and from trucks.  (Id.)  Containers are then moved through GPA's facilities, including the "container field".  (Id.)  GPA first employed Plaintiff in 1994 as a driver/operator in the container field.  (Doc. 22, p. 4.)  In 2005, Plaintiff moved to GPA's crane department to work as a crane operator.  (Id.; see doc. 31, p. 2.)  As a crane operator, Plaintiff worked under Karl Nell, GPA's general manager of cranes.  (Doc. 30-3, p. 3; doc. 30-7, p. 2.)

### B.     Plaintiff's Leave

In August 2018, Plaintiff applied for leave from work under the Family and Medical Leave Act ("FMLA") due to his PTSD.  (See doc. 22, pp. 5–6, 16, 19–22; see also doc. 31, p. 2.)  To apply for FMLA leave, Plaintiff gave a letter written by Dr. Laura and an FMLA application to a

nurse at GPA's Employee Health Services.[1]  (Doc. 22, pp. 5–6, 16, 19–22.)  The letter stated, "[Plaintiff] has a diagnosis of [PTSD] . . . [and] react[s] excessively under high stress conditions [compared to] the general population."  (Doc. 22, p. 16.)  The letter further stated that Plaintiff "is in need of space and time so he can practice relaxation[] technique[s] to calm down and continue performing his job."  (Id.)  Notably, the letter contained a signature block with Dr. Laura's name, address, and contact information, as well as a signature above the signature block.  (Id.)  The FMLA application Plaintiff submitted indicated that Plaintiff was "unable to perform any of his[] job functions," should not work, and "need[ed] to rest."  (Id. at pp. 20–21.)  GPA granted Plaintiff's requested leave.  (Doc. 31, p. 2.)

While on leave, Plaintiff participated in therapy once a week with Dr. Laura.  (Doc. 22, p. 7.)  On October 19, 2018, Rosa Simmons, a human resources manager with GPA, informed Plaintiff via letter that his leave was due to expire on November 2, 2018.  (Doc. 21-3, p. 7; doc. 21-9, p. 2.)  Simmons' letter stated that GPA needed Plaintiff to "contact Human Resources" and "provide [it] with documentation giving [it] [his] status and when [he] will be able to return to work."  (Doc. 21-3, p. 7.)  In response, Plaintiff sent GPA another letter from Dr. Laura and requested an additional twelve weeks of leave.  (Doc. 21-9, p. 2; see doc. 22, pp. 7, 17.)  This letter, like the first, contained a signature block including Dr. Laura's name, address, and contact information, as well as a signature above the signature block.  (Doc. 22, p. 17.)  GPA granted

---

[1] The record is unclear about which nurse initially reviewed Plaintiff's letter and FMLA application.  Donna Piper, a former nurse with GPA's Employee Health Services, testified that she and Ashley Tipton, another nurse with GPA's Employee Health Services, reviewed Plaintiff's letters.  (Doc. 24, pp. 2–3.)  Furthermore, Plaintiff contends that, at some point during his communications with Employee Health Services, he informed Piper that he suffered from PTSD and gave her a list of the medications he was taking.  (Doc. 22, p. 13.)  According to Plaintiff, Piper responded, "I wish you hadn't told me that."  (Id.)  Piper stopped working in mid-January 2019 and officially retired from GPA on either January 31 or February 1, 2019.  (Doc. 24, pp. 1–2.)

Plaintiff's request for additional leave, extending Plaintiff's leave to January 25, 2019.  (Doc. 22, p. 7.)

### C.    The Policy and the Return-to-Work Letter

Under GPA policy, for an employee on leave to return to work, the employee must provide a signed doctor's note indicating that it is safe for the employee to return to work (the "Policy").[2] (Doc. 21-12, p. 2; doc. 31, pp. 2–3; see doc. 23, p. 2; doc. 24, p. 3; doc. 25, pp. 6–7.)  Dr. Rick Timms, GPA's "company physician," testified that the Policy requires "a statement *of the treating professional* that the patient is able to return to work."[3]  (Doc. 26, pp. 5, 7 (emphasis added).)  While Dr. Timms "make[s] sure that [GPA's] employees are able to return back to work with a release from their physician," Altman testified that "if [Dr. Timms is] not [a patient's] physician and there's no note, there's no need for [Dr. Timms] to meet with [that patient]."  (Doc. 23, p. 4.)

---

[2] Whether the Policy is a written policy and requires a handwritten signature (rather than a digital signature) is unclear from the record.  (See doc. 21-12, p. 2; doc. 31, pp. 2–3.)  Lise Altman, GPA's chief human resources officer, stated in her Declaration that the Policy

> require[s] . . . an hourly employee who has been out for at least three days due to medical reasons [to] obtain and present to GPA a written doctor's note returning the employee to work and indicating that it is safe for the employee to return.  *This policy has*, *in my experience been unwritten except that the requirement of a doctor's note after a three[-]day absence is referred to in GPA's Employee handbook*. . . . [GPA] expect[s] the note to be signed by the doctor.

(Doc. 21-3, p. 2 (emphasis added).)  During her deposition, Altman testified that GPA has a policy "in the sick leave section [of the employee handbook] that says [an employee] need[s] to bring a written[,] signed doctor's note after [he or she] [has] been out for three or more days."  (Doc. 23, p. 3.)  Furthermore, Altman testified that an "electronic signature" would not suffice.  (Id. at p. 2.)  However, Simmons (the human resources manager) testified that she was unaware of any rule requiring a "wet ink" signature, (doc. 25, p. 6), and Dr. Rick Timms, GPA's "company physician," testified that GPA accepts electronic signatures, particularly if the letter is "from a system . . . where that's an accepted method of signature verification," (doc. 26, p. 7).

[3] Dr. Timms is a "general surgeon by training" and "ha[s] been in the practice of occupational medicine for [thirty] years."  (Doc. 26, p. 2.)  Notably, Dr. Timms is not "in the position to diagnose or treat a person with PTSD.  (Id.)  If a patient came to Dr. Timms with PTSD, Dr. Timms would refer that patient to "[s]omeone . . . trained in the management of mental health and PTSD specifically."  (Id.)

In January 2019, Simmons started communicating with Plaintiff about his possible return to work.  (Doc. 21-9, p. 2; doc. 22, p. 8.)  During these conversations, Plaintiff mentioned that he wanted to transfer to the container field because he believed it was a "less stressful environment." (Doc. 22, p. 9; see doc. 21-9, p. 2.)  GPA did not grant or deny Plaintiff's request to transfer, and instead, Simmons responded that she first "needed a doctor's note stating that he was able to return to work" and listing "what accommodations he would need."  (Doc. 21-9, pp. 2–3; see doc. 21-3, p. 2; doc. 22, p. 8.)  Plaintiff provided GPA with a letter from Dr. Laura, dated January 23, 2019, (the "Return-to-Work Letter").  (Doc. 21-3, pp. 3, 18; see doc. 22, pp. 8, 18.)  The Return-to-Work Letter states:

> This letter is being written on behalf of [Plaintiff,] who has been under my care since June 30, 2017[,] and has been seen at the VA for Mental Health since December 09, 2015.
>
> He has a diagnosis of [PTSD] [and,] after an acute PTSD episode[,] [Plaintiff] requested an FMLA letter since 08/10/18 through 1/25/19 and *he reports* to be able to come back to his work[.]   [T]he last appointment with this provider was on 12/05/18 and the next appointment will be on 02/06/19.
>
> [Plaintiff] needs to continue with psychiatry follow up appointments and continue with Individual or Group Therapy.

(Doc. 22, p. 18 (emphasis added).)  The Return-to-Work Letter, like the other letters written by Dr. Laura, is written on VA letterhead.  (Compare doc. 22, p. 18, with doc. 22, pp. 15–17.) However, unlike Dr. Laura's prior letters, the Return-to-Work Letter is not signed by Dr. Laura. (Compare doc. 22, p. 18, with doc. 22, pp. 15–17.)  At the time GPA received the January 23, 2019, Return-to-Work Letter, Plaintiff had not seen Dr. Laura in person for over a month and was next scheduled for an appointment on February 6, 2019.  (Doc. 22, p. 8.)

GPA determined that the Return-to-Work Letter did not meet the requirements of the Policy.  (See doc. 21-6, p. 2.)  According to Tipton, the Return-to-Work Letter suffered from two

deficiencies: (1) it was not signed, and (2) it "did not contain anything that appeared to be a release to work from" Dr. Laura.  (Id.)  Dr. Timms testified that, based on his review of Dr. Laura's letters, "there is no recommendation for a return to work and clearance and resolution of [Plaintiff's] mental health issues."  (Doc. 26, pp. 3–4.)  The parties dispute whether GPA ever informed Plaintiff of the Return-to-Work Letter's deficiencies.  GPA, relying on the testimony of Tipton, contends that it informed Plaintiff that the Return-to-Work letter did not satisfy the Policy and that GPA needed a different letter correcting the deficiencies.  (See doc. 21-1, p. 6 (citing doc. 21-6, pp. 2, 13).)  Plaintiff, however, testified that GPA never informed him that the Return-to-Work Letter was deficient, (doc. 22, pp. 8–10), and that he did not submit any additional doctor's notes, (doc. 31, p. 3).

> **D.    Rescheduled Doctor's Appointment and Plaintiff's Termination**

According to Plaintiff's Affidavit, at some point before he was terminated, he scheduled an appointment with Employee Health Services so that he could return to work.  (Doc. 30-3, p. 3.)  However, Employee Health Services rescheduled that appointment twice.  (Id.)  Then, on February 13, 2019, without Plaintiff having ever had the appointment, Simmons met with Plaintiff and informed him that GPA was terminating him.  (Doc. 22, p. 9; doc. 25, p. 4, doc. 30-3, p. 3.)  According to Simmons, she informed Plaintiff that, "because he was unable to attain a note from his doctor stating that he was able to return to work, . . . [GPA had to] remove him from payroll."  (Doc. 25, p. 4; see also doc. 30-3, p. 3.)  Plaintiff testified that Simmons "[b]asically [told him] that [he] was unable to return to work" but that the doctor's note was never mentioned.  (Doc. 22, p. 10.)  Plaintiff further testified, "[A]s far as my understanding[,] [the Return-to-Work Letter] was appropriate.  I didn't hear anything else about receiving [any] other doctor's note."  (Id.)

## II.      Procedural History

Plaintiff filed a complaint with the Georgia Commission on Equal Opportunity ("GCEO") in July 2019.  (Doc. 1-3, pp. 13–15.)  After the GCEO concluded that there was reasonable cause to believe that GPA engaged in an unlawful practice, (id. at p. 17), Plaintiff filed this suit in the State Court of Chatham County, (id. at pp. 2–10).  GPA subsequently removed the case to this Court, (doc. 1), and filed the at-issue Motion for Summary Judgment, (doc. 21).  The parties have fully briefed the Motion.  (Docs. 21-1, 30, 33, 35, 36.)

### STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party

discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  Accordingly, in considering GPA's Motion, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to Plaintiff.  See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (emphasis omitted).

## DISCUSSION

"The ADA was enacted 'to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life.'"  Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010) (quoting H.R. Rep. No. 101–485, pt. 2, at 23 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 304).  As such, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees, . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); see 42 U.S.C. § 12111(2) (the term

"covered entity" includes an employer or labor organization).  To establish a prima facie case of discrimination under the ADA, the plaintiff must show that: "(1) he is disabled; (2) he was a 'qualified individual' at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).

In the Complaint, Plaintiff alleges that GPA violated the ADA and the Georgia Disability Code by discriminating against him due to his PTSD.  (See doc. 1-3, pp. 7–9.)  Specifically, Plaintiff alleges that GPA (1) discharged him without "giving him the opportunity to . . . establish [his] ability to return to work" and (2) failed to provide a reasonable accommodation by not transferring him to the container field.  (Id. at pp. 8–9.)  GPA moves for summary judgment on both claims.  (See doc. 21-1.)

## I.    ADA Disability Discrimination Claim

GPA argues that it is entitled to summary judgment on Plaintiff's disability discrimination claim because it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and Plaintiff was not a qualified individual under the ADA.  (See doc. 21-1, pp. 9–11, 13–14.)  Plaintiff responds that (1) he has established a prima facie case of ADA discrimination, (doc. 30, pp. 7–12); (2) GPA has failed to prove a legitimate, non-discriminatory reason for his termination, (id. at pp. 12–14); and (3) GPA's reasons for his termination are pretext for unlawful discrimination, (id. at pp. 14–15).

Absent direct evidence of discrimination, a plaintiff must establish a prima facie case of intentional discrimination in violation of the ADA through circumstantial evidence using the

burden-shifting analysis set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[4]  <u>See</u>

<u>Wascura v. City of S. Miami</u>, 257 F.3d 1238, 1242–43 (11th Cir. 2001).  "To establish a prima

facie case of intentional discrimination, a plaintiff must show (1) he is disabled; (2) he is a qualified

individual; and (3) he was subjected to unlawful discrimination because of his disability."[5]  <u>Holly</u>

<u>v. Clairson Indus., L.L.C.</u>, 492 F.3d 1247, 1255–56 (11th Cir. 2007).  If the plaintiff makes this

prima facie showing, then the burden shifts to the employer to "'articulate a legitimate, non-

discriminatory reason' for the challenged action."  <u>Connelly v. WellStar Health Sys., Inc.</u>, 758 F.

App'x 825, 828 (11th Cir. 2019) (quoting <u>Wascura</u>, 257 F.3d at 1242).  If the employer does so,

the burden then shifts back to the employee to show that the employer's proffered reason is "mere

pretext" for unlawful discrimination.  <u>Id.</u>

 Even assuming Plaintiff established a prime facie case of ADA discrimination,[6] the Court

finds that GPA is entitled to summary judgment on Plaintiff's ADA disability discrimination claim

because Plaintiff failed to show sufficient evidence indicating that GPA's legitimate, non-

discriminatory reason for terminating Plaintiff—that he failed to obtain a signed doctor's note

clearing him to return to work—was pretextual.

---

[4]  The parties appear to agree that this case is a "circumstantial evidence" case, and, therefore, is analyzed under the <u>McDonnell Douglas</u> framework.  (<u>See</u> doc. 21-1, pp. 8–9; doc. 30, pp. 6–7.)

[5]  Although the <u>McDonnell Douglas</u> framework originated in the Title VII context, the Eleventh Circuit has since utilized it to analyze claims arising under the ADA.  <u>See, e.g.</u>, <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1193–95 (11th Cir. 2004) (ADA case decided using <u>McDonnell Douglas</u> framework).

[6]  Because the Court finds that Defendant articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff failed to show that reason was pretextual, the Court does not address whether Plaintiff established a prima facie case of ADA determination.

A.      **Whether GPA provided a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination**

"Once a plaintiff establishes a prime facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action." Calvo v. Walgreens Corp., 340 F. App'x 618, 624 (11th Cir. 2009) (citing EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)).  GPA argues that its decision to terminate Plaintiff and not permit him to work in either the container field or the crane area "was for a legitimate, non-discriminatory reason."  (Doc. 21-1, p. 9.)  Specifically, GPA argues Plaintiff failed to satisfy the Policy by not submitting a sufficient return-to-work letter.  (Id. at pp. 10–11.)

An employee's failure to obtain a doctor's note clearing him or her to return to work is a legitimate, non-discriminatory reason for an employer to prevent that employee from returning. See Calvo, 340 F. App'x at 624 ("Walgreens asserts that it refused to allow Calvo to return to work because she failed to produce a doctor's note that cleared her to do so.  Generally, a doctor's refusal to release a person to return to work is a legitimate reason for an employer to prevent that person from returning to work.") (citing 42 U.S.C. § 12112(d)(4) (an employer may ask for medical documentation that is "shown to be job-related and consistent with business necessity" and "may make inquiries into the ability of an employee to perform job-related functions"); see also Kincaid v. City of Omaha, 378 F.3d 799, 804 (8th Cir. 2004) (finding that a city's "standard operating procedures" that "required an injured employee to present a doctor's release, or 'fitness for duty certificate,' prior to reinstatement" was legitimate and non-discriminatory); Revels v. Lucent Techs., Inc., 60 F. App'x 740, 745–46 (10th Cir. 2003) ("The goal of the release requirement—to ensure that returning to work does not hamper recovery—is rational and legitimate.  We hold that Lucent has articulated a legitimate, non-discriminatory reason for refusing to allow Ms. Revels to return to work.").  Here, the record indicates that the Policy requires GPA employees who were

absent for three days or longer to provide a signed statement of the employee's treating doctor clearing the employee to return.  (See doc. 21-12, p. 2; doc. 31, pp. 2–3; see also doc. 23, p. 2; doc. 24, p. 3; doc. 25, pp. 6–7; doc. 26, p. 7.)  Indeed, Altman, Simmons, Nurse Piper, and Dr. Timms all testified about the Policy.  (See doc. 23, p. 2; doc. 24, p. 3; doc. 25, pp. 6–7; doc. 26, p. 7.)  Furthermore, the record shows that Altman, Tipton, and Dr. Timms did not believe the Return-to-Work Letter satisfied the Policy because it lacked a signature and did not contain a doctor's recommendation that Plaintiff may safely return to work.  (Doc. 21-3, p. 3; doc. 21-6, pp. 2, 13; doc. 26, p. 7.)

Plaintiff disputes whether the Policy is a "legitimate, non-discriminatory reason" for terminating his employment because, according to Plaintiff, GPA "routinely accepts return-to-work letters without handwritten signatures," and the Return-to-Work Letter did in fact satisfy the Policy.  (See doc. 30, pp. 12–14.)  However, GPA's "burden is merely one of production." Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000).  Indeed, it is not necessary for GPA to "persuade the [C]ourt that it was actually motivated by the [Plaintiff's] proffered reasons." Id. Rather, "[i]t is sufficient if [GPA's] evidence raises a genuine issue of fact as to whether it discriminated against [Plaintiff]." Id.  Thus, based on the evidence in the record (namely, the testimony regarding the Policy and GPA's belief that Plaintiff failed to satisfy the Policy), the Court finds that GPA met its burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.

### B.     Whether GPA's Proffered Reasons for Plaintiff's Termination are Pretext for Unlawful Discrimination

Because the Court finds that GPA articulated a legitimate, nondiscriminatory reason for its action, Plaintiff now "must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination" in order to avoid summary judgment.  Calvo, 340 F. App'x at

624 (quoting Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006)).

A plaintiff may satisfy this burden "by offering evidence that [the employer] more likely than not

acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless

the record conclusively shows that the real motive was a non-proffered reason that is non-

discriminatory." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "To

establish pretext, an employee must present evidence 'sufficient to permit a reasonable factfinder

to conclude that the reasons given by the employer were not the real reasons for the adverse

employment decision.'" Connelly, 758 F. App'x at 828–29 (quoting Wascura, 257 F.3d at 1243).

"An employee may do this by revealing 'such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions' in the employer's proffered reasons that a reasonable factfinder

would find them 'unworthy of credence.'" Id. at 829 (quoting Springer v. Convergys Customer

Mgmt. Grp., Inc., 509 F.3d 1344, 1348 (11th Cir. 2007)). If the "proffered reason is one that might

motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he]

cannot succeed by simply quarrelling with the wisdom of that reason." Alvarez, 610 F.3d at 1265–

66 (quoting Chapman, 229 F.3d at 1030).

　　　Plaintiff argues that "[a]ll the reasons provided by GPA for [his] termination are pretext

for ADA discrimination." (Doc. 30, pp. 14–15.) Plaintiff points to several purported facts he

contends show pretext: (1) the Return-to-Work Letter, which he claims was acceptable "both in

content and form"; (2) Employee Health Services rescheduled Plaintiff's appointments and failed

to see him prior to his termination; (3) comments made to Plaintiff by Piper; and (4) comments

made by Nell (the general manager of cranes).[7]  (See doc. 30, pp. 14–15; doc. 35, pp. 2–4.)  The Court finds that Plaintiff has failed to create an issue of material fact on the issue of pretext.

Concerning Plaintiff's first argument, he essentially argues that GPA's reason for terminating his employment (i.e., the deficient Return-to-Work Letter) was pretextual because the Return-to-Work Letter did in fact comply with the Policy.  (See doc. 30, pp. 14–15.)  Specifically, Plaintiff appears to assert that Dr. Laura did sign the Return-to-Work Letter via "electronic signature" rather than signing it by hand, (see doc. 30, p. 8 (discussing the "contradictory policy" that all "return-to-work letters need to be signed by hand")), and that the Return-to-Work Letter constitutes "medical documentation permitting him to return to work," (id.).  The Court is unpersuaded.  As an initial matter, "an employer's honest belief that an employee violated its policies can constitute a legitimate reason for termination even if the employer's belief may have been mistaken or wrong."  Connelly, 758 F. App'x at 829 (citing Smith v. PAPP Clinic, P.A., 808 F.2d 1449, 1452–53 (11th Cir. 1987)).  Here, Plaintiff's argument is essentially that, contrary to GPA's belief, the Return-to-Work Letter is sufficient under the Policy.  (See doc. 30, pp. 12–15.)  However, the Court does not "sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with discriminatory motive."  Connelly, 758 F. App'x at 830 (quoting Alvarez, 610 F.3d at 1266).  Indeed, an "employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a discriminatory reason."  Id. (emphasis added) (quoting Nix v. WLCY

---

[7] Plaintiff also asserts that "[h]e was not given any indication that he would have to submit a new [return-to-work letter] that" satisfied the Policy.  (Doc. 30, p. 15.)  Plaintiff is correct that, as discussed in Background Section I.C, supra, a factual dispute exists as to whether GPA informed him that the Return-to-Work Letter did not satisfy the Policy.  However, Plaintiff failed to explain how that factual dispute relates to whether GPA's reason for terminating him (i.e., his failure to comply with GPA Policy by providing a sufficient return-to-work letter) is pretextual.  (See doc. 30, p. 15; see also doc. 35.)

Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by*

Lewis v. City of Union City, 918 F.3d 1213 (11th Cir. 2019)).   Thus, even if GPA mistakenly

believed that Plaintiff failed to satisfy the Policy by submitting a deficient return-to-work letter,

that does not necessarily create a genuine issue of material fact concerning pretext.

Moreover, Plaintiff's argument misinterprets the evidence.   Regarding the lack of

signature, the text of the Return-to-Work Letter plainly contradicts Plaintiff's argument that Dr.

Laura digitally signed it.   (See doc. 21-3, p. 18.)   While the Return-to-Work Letter contains a

signature block containing Dr. Laura's name, address, and contact information, it is unsigned

(digitally or otherwise).   (See id.)   Notably, this is in contrast to the previous letters GPA received

from Dr. Laura, all of which contained signatures above the signature blocks.[8]   (See id. at pp. 9–

11.)   Thus, contrary to Plaintiff's assertion, the Return-to-Work Letter does not comply with the

Policy because it lacks any form of a signature.

The Court is also unpersuaded by Plaintiff's argument that the Return-to-Work Letter

constitutes "medical documentation permitting him to return to work" in satisfaction of the Policy.

(See doc. 30, p. 8.)   As stated above, the Policy requires an employee who was absent for three

days or longer to provide a signed statement from his or her treating physician clearing the

employee to return to work.   (See doc. 23, p. 2; doc. 24, p. 3; doc. 25, pp. 6–7; see also doc. 21-

12, p. 2; doc. 31, pp. 2–3.)   Dr. Timms clarified the Policy, testifying that "the criteria is a statement

*of the treating professional* that the patient is able to return to work."   (Doc. 26, p. 7 (emphasis

---

[8]   Plaintiff appears to argue that a question of material fact exists as to whether the Policy requires
handwritten rather than digital signatures on return-to-work letters.   (See doc. 30, p. 8 ("Altman claims the
GPA Employee Handbook stated that these notes must be signed by hand by the employee's physician, but
under neither the regular sick leave nor the FMLA section of the Handbook is it stated that the note must
be signed by hand.").)   Granted, as noted above, it is unclear from the record whether an electronic signature
is acceptable under the Policy.   See note 2, supra.   However, considering the Return-to-Work Letter in this
case contains neither a handwritten nor a digital signature, that dispute does not pertain to an issue of
material fact regarding pretext as to Plaintiff's termination.

added).)  Here, the pertinent part of the Return-to-Work Letter, which is dated January 23, 2019, states, "[Plaintiff] has a diagnosis of [PTSD], after an acute PTSD episode patient requested an FMLA letter since 8/10/18 through 01/25/19 and *he reports* to be able to come back to his work, the last appointment with this provider was on 12/05/19."  (Doc. 21-3, p. 18 (emphasis added).) Thus, contrary to Plaintiff's assertion, the Return-to-Work Letter does not appear to include a "statement of the treating professional that [he] is able to return to work." (Doc. 26, p. 7.)  Instead, the Return-to-Work Letter states that *Plaintiff* believes he can return to work.  (See doc. 21-3, p. 18.)  Thus, even looking at the Return-to-Work Letter in the light most favorable to Plaintiff, the Letter does not satisfy the Policy.  (See doc. 21-3, p. 3; doc. 21-6, pp. 2, 13; doc. 26, p. 7.)

To the extent Plaintiff argues that GPA did not follow its own policy in handling the Return-to-Work Letter, the Court is unpersuaded.  (See doc. 30, pp. 4, 8.)  Specifically, Plaintiff, citing Dr. Timms' testimony, appears to assert that GPA (1) did not follow its usual approach to unsigned doctor's notes, (see id. at p. 4), and (2) "frequently accepts unsigned return-to-work letters without issue," (id. at p. 8).  Regarding GPA's typical response to unsigned notes, Plaintiff argues that "when there is doubt surrounding a return[-]to[-]work letter, GPA and its medical office attempts to verify the letter either by requesting the employee submit a second letter or by personally contacting the physician treating the employee."  (Id. at p. 4 (citing doc. 26, p. 8).) However, Plaintiff misinterprets Dr. Timms' testimony.  Dr. Timms testified that if GPA "had everything [it] wanted from a *content* perspective" in a return-to-work letter and the *only* deficiency was the lack of signature, then GPA "would attempt to verify that [the letter] was, in fact, a legitimate letter from the [treating physician]."  (Doc. 26, pp. 7–8 (emphasis added).)  Dr. Timms further clarified that this verification would occur only "[i]f *it was clear* that [the return-to-work letter] was the opinion of the treating specialist."  (Id. at p. 8 (emphasis added).)  Thus, it

appears from the evidence that GPA did not violate its own policy by failing to contact Dr. Laura because, as explained above, the Return-to-Work Letter failed to state *Dr. Laura's* opinion that Plaintiff could safely return to work, meaning that the lack of the signature was not the only deficiency in the Return-to-Work Letter.

Moreover, contrary to Plaintiff's assertion, Dr. Timms did not testify that GPA's "medical department frequently accepts unsigned return-to-work letters without issue."  (Doc. 30, p. 8.) Rather, Dr. Timms testified that GPA has accepted return-to-work letters that were "not signed in wet ink but instead had . . . electronic signature[s] or . . . typed signature[s]," especially if those letters "came from a system . . . where [electronic signatures] [are] an accepted method of signature verification."  (Doc. 26, p. 7.)  Dr. Timms further explained that, here, the Return-to-Work Letter did not meet that criterion as it was "a piece of paper with a name but no signature."  (Id.)  Indeed, as stated above, the Return-to-Work Letter contained no signature above the signature block.  (See doc. 21-3, p. 18.)  Thus, there is simply no evidence that GPA deviated from its usual protocol when handling Plaintiff's Return-to-Work Letter.

Finally, even if GPA had deviated from its own policies in handling Plaintiff's Return-to-Work Letter, the Court notes that the "mere failure to follow operating procedures, without more, does not necessarily suggest that an employer was motivated by illegal discriminatory intent or that its proffered reason for termination was pretextual," Connelly, 758 F. App'x at 829 (citing Mitchell v. USBI Co., 186 F.3d 1352, 1355–56 (11th Cir. 1999)).  While "[a]n employer's departure from its normal policies and procedures can, in some cases, serve as evidence of pretext," id. (citing Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006)), a plaintiff must establish that his or her employer's "deviation from policy occurred in a discriminatory manner" to "establish pretext based on failure to follow internal procedures," id.

(quoting <u>Rojas v. Florida</u>, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002)).  Here, as explained below, Plaintiff failed to show anything "more" that suggests that GPA's deviation from its own policy (assuming that deviation happened) "occurred in a discriminatory manner."  <u>Id.</u>

Plaintiff points to several other facts he asserts suggest that GPA's reason for terminating him was pretextual: (1) Employee Health Services rescheduled Plaintiff's appointments and failed to see him prior to his termination, (doc. 35, pp. 1–2); (2) Piper stated, "I wish you hadn't told me that" when Plaintiff requested leave for his PTSD, (<u>id.</u> at p. 2); (3) in a comment directed to other GPA employees, Nell referred to Plaintiff's disability as "[a]n illness only [Plaintiff] knows about," (<u>id.</u> at pp. 2–3); and (4) Nell made "disturbing comments" to others about how "anyone beneath him w[ould] be dealt with if they dare[d] [to] report matters to HR," (<u>id.</u> at p. 3).  However, none of these facts specifically rebuts GPA's reason for terminating Plaintiff/prohibiting him from returning to work or demonstrates "such weakness[], implausibilit[y], inconsistenc[y][,] or contradiction[]" that a reasonable fact finder could find GPA's reason "unworthy of credence." <u>Springer</u>, 509 F.3d at 1348; <u>see also</u> <u>Jackson v. Agency for Persons with Disabilities Fla.</u>, 608 F. App'x 740, 742 (11th Cir. 2015) ("If the proffered reason is one that might motivate a reasonable employer, the plaintiff must meet the proffered reason 'head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'") (quoting <u>Chapman</u>, 229 F.3d at 1030).  Thus, the Court does not find this evidence, whether taken individually or collectively, sufficient to establish a genuine dispute of material fact on pretext.

First, Plaintiff fails to explain how the rescheduled doctor's appointments with Employee Health Services relate to his failure to comply with the Policy or the deficiencies in the Return-to-Work Letter.  (<u>See</u> doc. 35, pp. 1–2.)  Indeed, Plaintiff has not pointed to any evidence that seeing Dr. Timms would have replaced or abrogated the need to provide a return-to-work letter that

complies with the Policy.  (See id.)  Instead, Dr. Timms testified that PTSD is "outside of [his] specialty" and that, to "assess[] whether [Plaintiff] was able to safely return to work," he would have to "rely on the recommendation from the mental health professional after they had evaluated [Plaintiff]."  (Doc. 26, pp. 2–3.)  Thus, the fact that Employee Health Services may have rescheduled Plaintiff's doctor's appointments is not material to whether GPA held an honest belief that Plaintiff failed to satisfy the Policy by submitting a deficient return-to-work letter.

Concerning Piper's supposed comment about Plaintiff's PTSD diagnosis, that statement is insufficient to show that GPA's articulated reason for terminating Plaintiff was pretextual. According to Plaintiff, when he first requested leave, he provided Piper with a list of medications he was taking and informed her that he suffered from PTSD.  (Doc. 35, p. 2 (citing doc. 22, p. 13); see doc. 22, p. 13.)  Piper allegedly responded, "I wish you hadn't told me that."  (Id. (citing doc. 22, p. 13).)  While this vague statement might constitute "a stray comment" that could provide circumstantial evidence of pretext, "'statements by non[-]decisionmakers . . . fail to satisfy the plaintiff's burden of showing pretext." Thomas v. Dolgencorp, LLC, 30 F. Supp. 3d 1340, 1349 (M.D. Ala. 2014), aff'd by 645 F. App'x 948 (11th Cir. 2016) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Conner, J., concurring)); see, e.g., Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) (stating in an ADEA case that "stray workplace remarks, as well as statements made either by non[-]decisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish . . . pretext");[9] see also Alvarez, 610 F.3d at 1267–68 (holding that stray remarks by non-decisionmaker were "too weak

---

[9]  "Since many of the relevant legal standards applicable in employment-discrimination cases arising under the ADEA, the ADA, and Title VII are closely comparable, [the Court] cite[s] to them as appropriate." Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380, 388 n.3 (1st Cir. 2016); see generally Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1335 (11th Cir. 1999) ("[B]ecause of the similarities between the ADA and ADEA, we often apply the same doctrinal analysis from one statute to the other.").

to raise a genuine fact issue").  Here, nothing in the record indicates that Piper was responsible for or involved in the decision to terminate Plaintiff.  Instead, the record indicates that Piper retired from GPA prior to Plaintiff's termination.  (See doc. 22, p. 9 (Plaintiff's testimony that he was informed of his termination on February 13, 2019); doc. 24, p. 1 (Piper's testimony that her last day of work was "right before Martin Luther King [Jr. Day]" in 2019).)  Indeed, Piper testified that she did not have "any involvement at all in [Plaintiff's] termination" and was not consulted in the decision to terminate him.  (Doc. 24, p. 5.)  Furthermore, Plaintiff's deposition testimony does not provide enough details about the context of Piper's alleged statement to understand what Piper meant by that statement.  (See doc. 22, p. 13; see also Gonzalez, 304 F.3d at 69–70 (attributing less evidentiary weight to "stray workplace remarks" where the plaintiff failed to identify "the time [or] the context" of the remarks).  Finally, the timing of Piper's statement does not support Plaintiff's pretext argument.  Piper allegedly made the comment to Plaintiff when Plaintiff first requested leave from GPA.  (Doc. 35, p. 2.)  However, GPA granted Plaintiff's request for leave and then extended that leave months later upon Plaintiff's request.  Therefore, the timing of Piper's statement cuts against Plaintiff's efforts to establish pretext as that comment purportedly occurred before GPA granted Plaintiff's original request for leave and the subsequent extension of that leave.  See Martinez v. Gulf Coast Orthopedic Ctr. Corp., No. 8:17-cv-77-T-AEP, 2019 WL 3577214, at *10 (M.D. Fla. Aug. 6, 2019) (emphasis added) ("[G]iven the *timing* and lack of any connection between Dr. Bonati's statements and the decision to terminate Martinez, the statements from Dr. Bonati do nothing to further Martinez's efforts to establish pretext . . . .").  Thus, the Court finds that the statement from Piper fails to create a genuine dispute that GPA's proffered reason was a pretext.

The statements Nell purportedly made to GPA's crane operators are also insufficient to establish pretext.  Plaintiff first appears to rely on four statements made by Nell to GPA's crane operators.  (Doc. 35, p. 3.)  Nell allegedly stated to crane operators: (1) "If you people keep going to HR on me, then I promise you will lose your jobs"; (2) "If you throw me under the bus, then I will be like an 18-wheeler and run you over eighteen times"; (3) "You will be pencil whipped if you go to HR"; and (4) "I saved the company $750,000 in overtime and they like me, I'm not going anywhere."  (Id. (citing doc. 30-3, p. 4).)  However, none of these statements concern Plaintiff's PTSD diagnosis, requests for medical leave and/or accommodations, or GPA's articulated reason for terminating Plaintiff and/or not permitting him to return to work in either the container field or the crane department.  Indeed, these comments are completely unrelated to Plaintiff's disability or the decision to terminate him.  As such, these comments are insufficient to establish pretext.  See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination decision may *contribute* to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext.") (internal citation omitted); Rojas, 285 F.3d at 1343 (emphasis added) ("Because [the] alleged comment was . . . an isolated comment, *unrelated to the decision to fire Rojas*, it, alone, is insufficient to establish a material fact on pretext.") (emphasis added); Thomas v. Dolgencorp, LLC, 645 F. App'x 948, 951 (11th Cir. 2016) ("A stray comment by a supervisor that is unrelated to the employment decision will usually not be sufficient to show pretext absent some additional evidence supporting a finding of pretext."); see also Thomas v. Dolgencorp, LLC, 30 F. Supp. 3d at 1349 ("Gomillion's stray comment was unrelated to her decision to fire Thomas and, thus, fails to satisfy Thomas's burden on pretext.").

Finally, the Court finds that Nell's comment in a February 13, 2019, email is insufficient to establish pretext.  In the email, in response to a co-worker asking, "What's wrong w[ith] [Plaintiff]," Nell stated, "An illness only [Plaintiff] knows about."  (Doc. 30-2.)  However, this email does not establish pretext.  First, this email "is not a strong enough 'stray comment' to raise a dispute of material fact as to pretext."  Thomas v. Dolgencorp, LLC, 30 F. Supp. 3d at 1348. Even viewing this evidence in the light most favorable to Plaintiff, nothing about Nell's statement indicates any sort of discriminatory animus towards Plaintiff due to his PTSD.  Instead, the email shows Nell's lack of knowledge of Plaintiff's PTSD diagnosis.  (See doc. 30-2; doc. 30-7, p. 2.) Nell's response is unsurprising considering his testimony that, at that time he sent the email, he did not even know that Plaintiff suffered from PTSD.  (See doc. 30-7, p. 2.)  According to Nell, while he knew that Plaintiff was suffering from an illness and not "feeling well," Nell never inquired into the circumstances of why Plaintiff went on leave.  (See id. at p. 5.)  Furthermore, Plaintiff fails to explain how Nell's email (or his purported attitude towards Plaintiff's PTSD diagnosis) relates to the "decisional process" that led to Plaintiff's termination.  (See docs. 30, 35.) Though Nell wrote the email in response to a co-worker asking what was wrong with Plaintiff, Plaintiff fails to explain—much less show evidence indicating—how this comment relates to the termination decision or the decision to not allow him to return to work in the container field or the crane department.  (See docs. 30, 35); see Rojas, 285 F.3d at 1343 (emphasis added) ("Because [the] alleged comment was . . . an isolated comment, *unrelated to the decision to fire Rojas*, it, alone, is insufficient to establish a material fact on pretext.") (emphasis added); Thomas v. Dolgencorp, LLC, 645 F. App'x at 951 ("A stray comment by a supervisor that is unrelated to the employment decision will usually not be sufficient to show pretext absent some additional evidence supporting a finding of pretext."); Smith v. Winfield Dev. Co., 451 F. Supp. 2d 1327,

1347 (N.D. Ga. 2006) ("Stray ageist comments . . . made outside the decision-making process . . . are typically insufficient alone to prove pretext."); <u>Bowers v. Neopost, Inc.</u>, No. 1:06-CV-01201-HTW-LTW, 2008 WL 11406007, at *16 (N.D. Ga. Jan. 31, 2008) ("[T]o the extent that Plaintiff offers Devlin's allegedly ageist comments that Defendant needed to get rid of old people as evidence of pretext, this Court notes that such stray remarks, made outside the termination decision context, are typically insufficient alone to show pretext.").  Finally, Nell's email neither attacks GPA's articulated reason for not allowing Plaintiff to return to work (his failure to submit a return-to-work letter that satisfied the Policy) head on nor demonstrates that that reason is false.  <u>See</u> <u>Crawford v. City of Fairburn</u>, 482 F.3d 1305, 1309 (11th Cir. 2007) (failure to show pretext where comments suggested discriminatory animus but did not refute employer's articulated non-discriminatory reasons for terminating the plaintiff).  As such, the Court finds that Nell's single email is "nothing more than [a] 'stray remark[] that do[es] not create a material issue of fact concerning pretext.'"  <u>Mosiejute v. Wal-Mart Stores E., LP</u>, No. 19-CV-61046-JMS, 2021 WL 271559, at *9 (S.D. Fla. Jan. 26, 2021).  In short, Nell's email is not evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [GPA's] proffered legitimate reason[] for its action that a reasonable factfinder could find [that reason] unworthy of credence."  <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997).

Based on the foregoing, the Court finds that, even assuming Plaintiff set out a prima facie case of ADA disability discrimination, he failed to introduce sufficient evidence establishing that GPA's articulated, legitimate reason for terminating him was pretextual.  Accordingly, GPA is entitled to summary judgment on Plaintiff's ADA disability discrimination claim.

## II.      ADA Failure to Accommodate Claim

Plaintiff alleges that GPA should have accommodated him by transferring him from the crane department to a position in the container field, a position Plaintiff considered less stressful than the crane department.  (See doc. 1-3, p. 8; doc. 22, p. 4.)  GPA argues that it is entitled to summary judgment on this claim because Plaintiff was not a qualified individual, and Plaintiff failed to submit a return-to-work letter that satisfied the Policy.  (See doc. 21-1, pp. 12–14.)  "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer."   Lucas, 257 F.3d at 1255 (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).  Furthermore, the McDonnell Douglas burden-shifting framework "does not apply to reasonable accommodation cases under the ADA."  Medearis v. CVS Pharmacy, 92 F. Supp. 1294, 1303 (N.D. Ga. 2015) (citing Nadler v. Harvey, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007); Holly, 492 F.3d at 1262); see Juback v. Michaels Stores, Inc., 143 F. Supp. 3d 1195, 1213 (M.D. Fla. 2015) ("The McDonnell Douglas burden shifting framework is inapplicable to reasonable accommodation claims, so [the plaintiff] must only establish that he was a qualified individual with a disability and was denied a reasonable accommodation.").  "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job."  Early v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  Examples of reasonable accommodations included "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position."  Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015) (quoting 42 U.S.C. § 12111(9)(B)).  Furthermore, "[e]ssential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'"  Id. (quoting 29 C.F.R. § 1630.2(n)(1)).  "The

plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." Lucas, 257 F.3d at 1255-56.

In this case, Plaintiff contends that GPA failed to reasonably accommodate him by transferring him to the container field. (Doc. 1-3, p. 8.) While the ADA provides that a reasonable accommodation *may* include reassignment, 42 U.S.C. § 12111(9)(B), the Eleventh Circuit has stated that "[t]he ADA does not say or imply that reassignment is *always* reasonable." United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1345 (11th Cir. 2016). Instead, "reassignment will be reasonable in some circumstances but not in others." Id. According to "well-settled" ADA precedent in this Circuit, "employers are only required to provide 'alternative employment opportunities reasonably available under the employer's existing policies.'" Id. (quoting Terrell v. USAir, 132 F.3d 621, 627 (11th Cir. 1998)). "An employer is not required to reassign a disabled employee in circumstances 'when such a transfer would violate a legitimate, nondiscriminatory policy of the employer.'" Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998); see Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 679 (7th Cir. 1998) ("[W]e have been unable to find a single ADA . . . case in which an employer has been required to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer.").

In US Airways, Inc. v. Barnett, 535 U.S. 391 (2002), the United States Supreme Court established a framework for cases "where a job reassignment (i.e., the requested accommodation) is claimed to violate a disability-neutral rule of the employer." St. Joseph's Hosp., 842 F.3d at 1345–46 (citing Barnett, 535 U.S. at 406)). Under the Barnett framework, "[t]he first step requires the employee to show that the accommodation is a type that is reasonable in the run of cases." Id. at 1346. If the accommodation is "reasonable in the run of cases," the burden shifts to the employer

to show that granting the accommodation would impose an undue hardship under the specific circumstances of the case.  Id.  If, however, the accommodation is not reasonable in the run of cases, the employee must show that "special circumstances warrant a finding that the accommodation is reasonable."  Id.; see Shapiro v. Twp. of Lakewood, 292 F.3d 356, 360–61 (3d Cir. 2002) (explaining the Barnett framework).

Here, the Court finds that, under the circumstances, Plaintiff's request to be transferred to the container field was not a reasonable accommodation.  As discussed in Discussion Section I.A, supra, the at-issue Policy is legitimate and non-discriminatory, and, as discussed in Discussion Section I.B, the Return-to-Work Letter failed to meet the Policy's requirements and the parties agree that Plaintiff failed to submit any subsequent return-to-work letter that satisfied the Policy. Plaintiff's argument, in essence, amounts to requiring GPA to waive the requirements of the Policy by permitting him to return to work after an extended leave without submitting a sufficient return-to-work letter (and then to allow him to transfer to a different department).   Such an accommodation is not reasonable and is not required under Eleventh Circuit ADA precedent.  See Frazier-White v. Gee, 818 F.3d 1249, 1257 (11th Cir. 2016) ("ADA does not require [employers] to reassign [disabled employees] in violation of [their] governing civil service rules."); St. Joseph's Hosp., 842 F.3d at 1346 (finding reassignment unreasonable where transfer would have violated employer's "best-qualified applicant policy").  Finally, Plaintiff failed to identify any "special circumstances" that warrant a finding that his requested accommodation is reasonable.  (See docs. 30, 35.)

Based on the foregoing, the Court concludes that GPA is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

### III.     State Law Claims

Plaintiff also asserts a disability discrimination claim against GPA under the Georgia Disability Code.  (Doc. 1-3, p. 9.)  Because the Court finds that GPA is entitled to summary judgment on all federal claims brought by Plaintiff, see Discussion Sections I & II, supra, the Court exercises its discretion to remand the remaining state law claims.  See 28 U.S.C. § 1367(c).  This case is before the Court on federal question jurisdiction, (doc. 1, p. 2), and the Court has been exercising supplemental jurisdiction over Plaintiff's state law claims, see 28 U.S.C. § 1367(a); (see also doc. 1, p. 2.)   While the "dismissal of [Plaintiff's] underlying federal question claim[s] does not deprive the [C]ourt of supplemental jurisdiction over non-diverse state law claims," the Court possesses the discretion under 28 U.S.C. § 1367(c) "to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the court has dismissed all claims over which it had original jurisdiction."  Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1352 (11th Cir. 1997).  28 U.S.C. § 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine— judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1998).  For that reason, the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state law claims when, as here, the federal claims have been dismissed prior to trial."

<u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam).  Additionally, district courts' discretion extends to remanding cases properly removed to federal court.  <u>Carnegie-Mellon</u>, 484 U.S. at 357.

Because the Court finds that GPA is entitled to summary judgment on all federal claims brought by Plaintiff, the only remaining claims before the Court are the state law claims brought under the Georgia Disability Code.  (<u>See</u> doc. 1-3, pp. 7–9.)  Therefore, the factors contained in Section 1367(c) favor remand, and the Court exercises its discretion to remand the remaining state law claims.  <u>See, e.g.</u>, <u>Vibe Micro, Inc. v. Shabanets</u>, 878 F.3d 1291, 1296 (11th Cir. 2018) ("When all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well.").

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Georgia Ports Authority's Motion for Summary Judgment.  (Doc. 21.)  Specifically, the Court grants summary judgment in favor of Defendant Georgia Ports Authority on all federal claims asserted against it.  The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment, to **REMAND** the remainder of this case to the State Court of Chatham County, and to **CLOSE** this case as before the United States District Court for the Southern District of Georgia, Savannah Division.

**SO ORDERED**, this 28th day of July, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA